Filed 3/17/17

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DAVID WARREN CHESTRA,<br><br>    Defendant and Appellant. | B264462<br><br>(Los Angeles County<br>Super. Ct. No. BA402910) |

    APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa B. Lench, Judge.  Affirmed as modified with directions.

    Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

    Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior

---

\*    Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts III (A)-(B) and (D)-(H).

Assistant Attorney General, Scott A. Taryle and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

## I.  INTRODUCTION

A jury convicted defendant, David Warren Chestra, of first degree murder in violation of Penal Code section 187, subdivision (a).[1]  The jury further found defendant personally and intentionally discharged a firearm causing death.  (§ 12022.53, subd. (d).)  Defendant admitted four prior conviction allegations within the meaning of sections 667, subdivision (d) and 1170.12, subdivision (b) were true.  Defendant was sentenced to 100 years to life in state prison.  We modify the oral pronouncement of judgment to include a $300 parole revocation restitution fine. (§ 1202.45.)  In the published portion of this opinion, we discuss why any error in failing to instruct on voluntary manslaughter was harmless.  We affirm the judgment in all other respects.

## II.  THE EVIDENCE

Defendant was a self-described former gang member. Defendant testified that as a gang dropout, he was at risk of being killed.  Viewed in the light most favorable to the verdict (see *People v. Hubbard* (2016) 63 Cal.4th 378, 392; *People v. Iniguez* (1994) 7 Cal.4th 847, 854), the evidence established the following.  On July 5, 2012, defendant shot and killed a former friend and fellow gang member, Gary Burks.  Defendant was

---

[1] Further statutory references are to the Penal Code except where otherwise noted.

accompanied by his girlfriend, Brandy Ricks. Defendant kicked in Mr. Burks's apartment door. Mr. Burks, armed with a pair of scissors, attempted to block the door. Defendant reached around the door and fired his weapon several times striking Mr. Burks in the head.

The morning after the murder, defendant was arrested on a parole violation. Defendant subsequently entered a guilty plea to owning or possessing the firearm within the meaning of Penal Code section 29900. Both the gun, a .44-caliber revolver, and the unique ammunition used to commit the murder were found in a car owned by Ms. Ricks, but used by both defendant and Ms. Ricks. The car key was in defendant's pocket. The gun was hidden in the engine compartment. Six rounds were missing from the box of ammunition. Defendant and Ms. Ricks had purchased the ammunition several days prior to the murder. This transaction was captured on surveillance videotape.

Defendant was subsequently questioned by detectives and confessed to the crime. He described in detail the location, the physical surroundings and the manner in which he killed the victim. Defendant's description was consistent with the evidence at the murder scene. As to the reason for the killing, defendant described himself as a gang "dropout." Defendant explained, "[The victim] was talking shit, so I, myself, took his punkass life." Defendant said, "I was gonna kill all my homies." At another point, defendant explained: "[The victim] didn't think I was coming, but I came. I got him. . . . This is my own gang shit. I'm a drop out from my hood. . . . ." Defendant also said Mr. Burks may have raped Ms. Ricks. Defendant told detectives: "I found out [Ms. Ricks and Mr. Burks] were doing some shit together, that he raped her. She, she told me. I don't even think

it was a rape.  She was asleep.  So I just took that on, on account of myself and shit."

After confessing, defendant also wrote a letter to his wife, a member of defendant's former gang who had opposed his decision to leave the gang.  Defendant said:  "Your punk ass got Big Crow murdered by me!  [The word "me" is underlined twice.]  . . . [L]ucky I got caught cuz all them fools were next.  . . .  Flaco's punk ass got lucky, but both them niggas felt my wrath who put hands on P.NuT, [a gang member who had died] . . .  I tried to change but the hood wouldn't stop.  So I ended the nigga[']s life.  That simple.  Don't worry I already confessed . . . ."

While in custody prior to trial, defendant also told deputies:  "I'm gonna fucking kill a fucking cop or a fucking nurse . . . .  That's fucking for real.  I'm a . . . I'll be calm for a month.  Two months, I'll wait.  Three months, I'll wait.  Killed my homeboy.  I waited six months.  Fucking talking about?  Shot that fool in the head with a four-four.  Kicked down the door.  Right in the middle of his brain.  Shit came out the shit.  Think I won't kill a motherfucking cop over this.  Killed my homeboy."  (As noted above, the murder weapon was a .44-caliber revolver.)

At trial, however, defendant denied shooting Mr. Burks.  Defendant testified it was Ms. Ricks who shot and killed Mr. Burks.  Defendant said he had gone to Mr. Burks's apartment with Ms. Ricks to acquire cocaine.  Mr. Burks was a member of defendant's former gang.  When Mr. Burks saw defendant in the hallway, he said, "What's up, meaning "Fuck you."  Mr. Burks retreated into the apartment, returned with a pair of scissors in his hand, and tried to stab defendant.  (Homicide investigators found Mr. Burks gripping the scissors in his hand.)  A physical altercation between the two ensued.  The fight ended when Ms.

4

Ricks shot Mr. Burks.  Defendant said he did not know Ms. Ricks was armed.  Defendant testified he falsely confessed to the murder in order to protect Ms. Ricks.  Defendant said he was telling the truth at trial because he was terminally ill.

## III.  DISCUSSION

[Parts III (A)-(B) are deleted from publication.  See *post* at page __ where publication is to resume.]

### A.  Ineffective Assistance of Counsel

Defendant raises ineffective assistance of counsel claims with respect to certain jury instruction issues as discussed below.  To establish constitutionally ineffective assistance of counsel, a defendant must show both deficient performance, i.e., counsel's representation fell below an objective standard of reasonableness under professional norms, and prejudice.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Cunningham* (2001) 25 Cal.4th 926, 1003; *People v. Kraft* (2000) 23 Cal.4th 978, 1068.)  Further, as our Supreme Court has held, "If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.  (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-268.)"  (*People v. Kraft, supra,* 23 Cal.4th at pp. 1068-1069; accord, *People v. Huggins* (2006) 38 Cal.4th 175, 206.)  An appellate court will not second-guess counsel's reasonable trial

5

tactics.  (*People v. Riel* (2000) 22 Cal.4th 1153, 1185; *People v. Avena* (1996) 13 Cal.4th 394, 444.)

With respect to prejudice, a defendant must establish there is a reasonable probability the result would have been more favorable to him or her absent defense counsel's failings. (*Strickland v. Washington, supra,* 466 U.S. at p. 694; *People v. Dickey* (2005) 35 Cal.4th 884, 913.)  A defendant must show a reasonable probability of a different result as a demonstrable reality.  (*People v. Lawley* (2002) 27 Cal.4th 102, 136; *People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.)  A trial attorney is not ineffective for failing to pursue implausible arguments, meritless motions or futile objections.  (*People v. Prieto* (2003) 30 Cal.4th 226, 261; *People v. Ochoa* (1998) 19 Cal.4th 353, 432; *People v. Lewis* (1990) 50 Cal.3d 262, 289.)  Moreover, as the United States Supreme Court has held: "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.  . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland v. Washington, supra,* 466 U.S. at p. 697; accord, *People v. Carrasco* (2014) 59 Cal.4th 924, 982; *In re Champion* (2014) 58 Cal.4th 965, 1007.)

## B.  Defendant's Confession

Defendant asserts detectives coerced his confession by impliedly promising leniency for Ms. Ricks.  Defendant further argues his trial attorney, Deputy Public Defender Elizabeth Lashley-Haynes, was ineffective for failing to challenge the

6

admissibility of his tape-recorded confession as involuntary. We find no coercion and no ineffective assistance.

### 1. The applicable involuntary confession law

A defendant's confession may be involuntary when the police make certain express or clearly implied promises. The types of inducements which can render a statement inadmissible include promises of leniency toward or freedom for the accused, a relative or a loved one, when the promise motivates the defendant to take responsibility. (E.g., *People v. Tully* (2012) 54 Cal.4th 952, 993 [witness protection promise]; *People v. Weaver* (2001) 26 Cal.4th 876, 920 [threats to arrest family members]; *People v. Boyde* (1988) 46 Cal.3d 212, 238, disapproved on another point in *People v. Johnson* (2016) 62 Cal.4th 600, 648 [implied promise of leniency]; *People v. Steger* (1976) 16 Cal.3d 539, 550 [desire to free spouse]; *People v. Trout* (1960) 54 Cal.2d 576, 584-585, overruled on another point in *People v. Cahill* (1993) 5 Cal.4th 478, 509-510 [same]; *People v. Matlock* (1959) 51 Cal.2d 682, 697 [threat to arrest relatives]; *People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1401 [leniency for defendant's child's mother].) The question is whether, under all the surrounding circumstances, a promise was expressly made or implied, and if so, whether it motivated the defendant's confession. (*People v. Tully, supra,* 54 Cal.4th at p. 986; *People v. Massie* (1998) 19 Cal.4th 550, 576.)

Our Supreme Court has explained: "A confession is 'obtained' by a promise within the proscription of both the federal and state due process guaranties if and only if inducement and statement are linked, as it were, by 'proximate' causation. This is

7

certainly true for the federal right.  The requisite causal connection between promise and confession must be more than 'but for': causation-in-fact is insufficient.  (*Hutto v. Ross* [(1976)] 429 U.S. [28,] 30,  (*per curiam* ).)  'If the test was whether a statement would have been made but for the law enforcement conduct, virtually no statement would be deemed voluntary because few people give incriminating statements in the absence of some kind of official action.'  (*U.S. v. Leon Guerrero* (9th Cir. 1988) 847 F.2d 1363, 1366, fn. 1.)  The foregoing is also true for the state right.  (*People v. Kelly* [(1990)] 51 Cal.3d [931,] 974 (conc. opn. of Mosk, J.).)"  (*People v. Benson* (1990) 52 Cal.3d 754, 778-779; accord, *People v. Tully, supra,* 54 Cal.4th at pp. 985-986.)

Further, when the benefit suggested by law enforcement officers flows naturally from a truthful confession, the defendant's statement will not be considered involuntary.  (*People v. Tully, supra,* 54 Cal.4th at p. 993; *People v. Howard* (1988) 44 Cal.3d 375, 398.)  As explained in *People v. Boyde, supra,* 46 Cal.3d at page 238, "Mere advice or exhortation by the police that it would be better for the accused to tell the truth, when unaccompanied by either a threat or a promise, does not . . . make a subsequent confession involuntary. [Citation.]"  (Accord, *People v. Dowdell, supra,* 227 Cal.App.4th at p. 1401.)

In addition to coercion, considerations affecting voluntariness include the interrogation's length and location.  Also relevant are the defendant's maturity, education, physical condition, mental health and experience with the criminal justice system.  (*Withrow v. Williams* (1993) 507 U.S. 680, 693-694; *People v. Williams* (1997) 16 Cal.4th 635, 660.)

8

Here, of course, the trial court never made a voluntariness determination.  But when, as here, the interview is recorded, the facts surrounding the confession are undisputed, and review on appeal is de novo.  (*People v. Duff* (2014) 58 Cal.4th 527, 551; *People v. McWhorter* (2009) 47 Cal.4th 318, 346.)

## 2.  Defendant's confession

Detective Terence Keyzer and his partner, identified only as Detective Acero, interviewed the 39-year-old defendant at the Riverside County Jail.  Defendant was in custody on a parole violation.  The interview lasted just over one hour.  Defendant was experienced in the criminal justice system having been sentenced to state prison on several prior occasions.

At the outset of the interview, Detective Keyzer twice advised defendant that he did not have to talk to them.  Defendant acknowledged that he understood.  He proceeded to speak with the detectives without objection.  "Detective Keyzer: We're here to talk to you about a couple of things.  Understand you're free to go, you know, go back to your cell or not talk to us or anything like that.  That's completely up to you.  Do you understand that?  [¶]  [Defendant]:  Yeah, what's it about?  [¶]  . . .  [¶]  Detective Keyzer:  . . .  And, like I said, I'm - - we're not here accusing you or anything, and you, you know, you don't - - you're free to leave any time.  Okay?  But he was a friend of yours?  [¶]  [Defendant]:  Yeah."  Later, Detective Keyzer reiterated the point.  "Hey, like I said, you're not under arrest for this.  You can end this conversation and leave at any time.  Okay?  The - - do you understand that?  [¶]  [Defendant]:  (No Audible Response)."  And after defendant learned Ms. Ricks had

9

accused him of shooting Mr. Burks, Detective Keyzer told him: "The first thing I told you when you were in here, you're not under arrest.  You don't have to talk to us or anything."

The detectives told defendant:  there was some evidence Ms. Ricks was involved in the murder; they had spoken with her; she told them "how this went down"; and she said the detectives should talk to defendant because he could explain what had happened.  Defendant denied any knowledge of the incident.  He denied even knowing that Mr. Burks had died.  He said he could not understand why Ms. Ricks would tell the detectives to talk to him.  In an attempt to determine what happened and whether defendant's version of events matched Ms. Ricks's, the detectives incrementally fed defendant additional information:  there was ballistic evidence connecting Ms. Ricks to the murder; Ms. Ricks said defendant "had something to do with it"; Ms. Ricks was in jail for the murder; Ms. Ricks said defendant was there when Mr. Burks got shot and it was "a self-defense thing"; Ms. Ricks had acquired the gun that was used; Mr. Burks had something in his hand, so Ms. Ricks "seen it was done out of self-defense"; a witness had seen a Black male and a White female running from Mr. Burks's back gate to a car; Ms. Ricks said defendant and she had gone to Mr. Burks's place and there was an argument; the detectives knew Ms. Ricks's car had been at the scene; and Ms. Ricks admitted she was the one who acquired the gun.

Defendant asked where was Ms. Ricks, had she been charged, and where was her son.  He wanted to know what Ms. Ricks had told the detectives.  He said he did not want to get Ms. Ricks into any trouble.  He did not want to say anything that would be detrimental to him.  He continued to steadfastly deny any involvement in the crime.  Detective Keyzer said that if

10

defendant just explained what really happened, he would be helping himself and helping Ms. Ricks as well.  He said Ms. Ricks was "looking at murder" and, "[W]e got her pretty tight on that." Defendant wanted to speak with Ms. Ricks.  The request was denied.  Defendant was unconvinced that Ms. Ricks had told detectives he was present when Mr. Burks was shot.

The detectives then took the position that if defendant was not present, then Ms. Ricks was lying, there was no self-defense and Ms. Ricks must have killed Mr. Burks.  "Detective Keyzer:  . . . [I]f you can't explain [how it went down and why it was self-defense] cause you weren't there, then that means she's just - - [¶]  Detective Acero:  Then it's all on her.  [¶]  Detective Keyzer: Yeah, that she's a liar and that's, that's the end of that, you know?"  Defendant still denied being present.

The course of the conversation began to turn after Detective Keyzer told defendant Ms. Ricks said defendant shot Mr. Burks.  "[Defendant]:  I mean, why (Inaudible) she said I can explain.  She said I can explain why it was self-defense - -  [¶] Detective Keyzer:  Right. [¶]  [Defendant]: - - why her self - - so she's telling you she shot Gary Burk[s]?  [¶]  Detective Keyzer: No, she's not telling us that.  [¶]  [Defendant]:  Then how is she saying it's self-defense?  [¶]  Detective Keyzer:  She's saying that you shot Gary Burks - -  [¶]  . . . [¶]  [Defendant]:  So I'm gonna be getting arrested then.  [¶]  Detective Keyzer:  . . . [B]ut we're not arresting you.  . . .  [¶]  . . . [¶]  [Defendant]:  -- you're going to pretty soon.  [¶]  Detective Keyzer:  For what?  We have her. [¶]  . . . [¶]  Detective Keyzer:  . . . We don't - -  . . .  That's what she said[, that defendant shot Mr. Burks].  We're here trying to verify her story.  She said that you won't let her go down for this, and that you would be honest and tell the truth of what

11

happened. . . . - - this was a self-defense thing. That's what she said. It was self-defense. She said you had to do it. It was self-defense cause he - - [¶] . . . [¶] . . . he had something. That's what she told us. [¶] Detective Acero: Supposedly, Gary had something, that he was . . . coming at you - - [¶] [Defendant]: Look - - [¶] . . . [¶] . . . - - I wasn't there. [¶] . . . [¶] [Defendant]: Man, I gotta talk to her, man. [¶] . . . [¶] . . . She's a liar, a good liar, yeah, yep. So she said I shot him, so that means I'm about to get arrested for somebody saying that I shot somebody. I'm definitely gonna get arrested."

Some discussion followed about the lack of connection between defendant's parole violation matter and the murder investigation. Detective Keyzer told defendant: "[W]e're not here to talk to you about [your parole violation matter]. That's something you're dealing with on another level. We're here talking about Brandy." Defendant then confessed. He said Ms. Ricks was not there, she stayed in the car. He explained that it was a gang-related murder and he was the one with the motive. "[Defendant]: You gotta release Brandy. She wasn't there. I killed that nigga. Fuck that nigga, Crow. Fuck Crow from [defendant's former gang]. I killed that nigga. [¶] Detective Keyzer: Why? [¶] [Defendant]: I did it. No, I'll just, I'll just take it for her. I did it. . . . Arrest me. [¶] . . . [¶] Detective Keyzer: - - you gotta explain to me - - [¶] [Defendant]: I would've killed all of them. I could've killed Crow, Little Crow, Flaco. Who else? . . . [¶] . . . [¶] . . . I'm a drop out. Them motherfuckers, fuck them. I shot that nigga in his head, reached over from the door, hit that motherfucker four times with a four - - with a four - - with the - - shit . . . Release Brandy. You gotta release her though. [¶] Detective Keyzer: All right. [¶]

12

[Defendant]: - - you gotta fuckin' release my girl. [¶] Detective Keyzer: We gotta verify your story. [¶] [Defendant]: Fuck, I just gave you the story. . . . I kicked down the fuckin' door. I had Vans. There's should be a Van print in ballistics. Kicked the motherfucker down. I reached around, popped the motherfucker four times, . . . Now, you gotta release her, man, right?"

Defendant repeatedly demanded that Ms. Ricks be released. He said she was trying to take the blame but she had nothing to do with it. He tried to convince the detectives not to pursue Ms. Ricks for any involvement. Defendant wanted the detectives to show Ms. Ricks his written confession. Defendant continued: "You know, like you said, she put me there. I'm gonna get busted anyway. It's gonna come out - - . . . I let the motherfucker have it. Fine. But Brandy didn't have nothing to do with it. She wasn't even there. Give her that." Defendant continued: "[Ms. Ricks] was raped by Gary Burks . . . a while back. She was completely drunk and high, out of her mind. And I . . cause I don't feel like going to court and all this. I want to get it over with - - and I . . . drove her, made her wait in the . . . car. I drove, made her wait in the car, right, because I knew where he lived. Motive is mine. I'm a drop out. He was talking shit, so I, myself, took his punk ass life. I love my girl, Brandy, and she didn't know about it at all. I did it all myself. This is all true."

### 3. Application of the law to the present case

We find no coercion undermining the voluntariness of defendant's confession. Detective Keyzer repeatedly told defendant he did not have to talk to the detectives. Neither detective at any time expressly promised leniency for Ms. Ricks.

Nor did they imply it. They never suggested Ms. Ricks would be released if defendant confessed. Prior to the moment defendant confessed, the detectives sought to learn what had happened. The detectives wanted to know whether defendant's account was consistent with what Ms. Ricks had told them. The detectives said defendant's truthful account of the shooting might help both defendant and Ms. Ricks. They explained that if defendant denied any involvement, they would have to assume that Ms. Ricks was lying to them and that she was the guilty party. Defendant continued to deny any involvement despite knowing the detectives had strong evidence implicating Ms. Ricks. Defendant confessed only after the detectives revealed Ms. Ricks had named him as the shooter. That information led defendant to conclude he would be arrested for the murder. Prior to defendant's confession, he had inquired only where Ms. Ricks was and whether she had been charged. He did not ask for leniency for her in return for providing information. The discussion about Ms. Rick's fate, and defendant's insistence that she was not involved and must be released, came only after defendant confessed. His confession therefore was voluntary.

We further conclude that because defendant's confession was voluntary, Ms. Lashley-Haynes was not ineffective for failing to bring a meritless motion to suppress it. Defendant has failed to establish as a demonstrable reality that there is a reasonable probability the trial court would have granted a motion to suppress his confession. Thus, he has failed to sustain his prejudice burden on his ineffectiveness claim. (*People v. Mayfield* (1993) 5 Cal.4th 142, 175-176; *People v. Robertson* (1982) 33 Cal.3d 21, 40.)

14

## C. Self-defense Instruction

Defendant asserts it was prejudicial error and a violation of his due process and jury trial rights not to sua sponte instruct on self-defense. Defendant reasons that as a gang dropout he was in danger of being killed by gang members including Mr. Burks. (There was some inconsistent evidence on this point at trial. Defendant testified that from the moment he left the gang he was targeted for death. Defendant also testified: "[M]y homeboys are never after me. We never had that type of beef. Never.") Further, Mr. Burks tried to stab defendant with scissors. In the alternative, he argues Ms. Lashley-Haynes acted ineffectively because she failed to request self-defense instructions. We find no error, hence no constitutional rights violation (*People v. Garcia* (2011) 52 Cal.4th 706, 755, fn. 27; *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17) and no ineffective assistance.

Our Supreme Court has explained: "'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' (*People v. St. Martin* (1970) 1 Cal.3d 524, 531.)" (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) The obligation to instruct on general principles of law extends to defenses. (*People v. Breverman, supra,* 19 Cal.4th at p. 157; *People v. Sedeno* (1974) 10 Cal.3d 703, 716, disapproved on another point in *People v. Breverman, supra,* 19 Cal.4th at p. 163, fn. 10.) With respect to defenses: "[T]he duty to give instructions, *sua sponte*, on particular

defenses and their relevance to the charged offense arises only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case. Indeed, this limitation on the duty of the trial court is necessary not only because it would be unduly burdensome to require more of trial judges, but also because of the potential prejudice to defendants if instructions were given on defenses inconsistent with the theory relied upon." (*People v. Sedeno, supra,* 10 Cal.3d at p. 716; accord, *People v. Wickersham* (1982) 32 Cal.3d 307, 326, disapproved on another point in *People v. Barton* (1995) 12 Cal.4th 186, 201.) Our review is de novo. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581; *People v. Waidla* (2000) 22 Cal.4th 690, 733.)

To prevail on a self-defense claim, a defendant must establish: he actually and reasonably believed he was in imminent danger of death or great bodily injury; he reasonably believed the use of deadly force was necessary to defend against the danger; the belief was objectively reasonable; and he used no more force than was reasonably necessary under the circumstances. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082; *People v. Flannel* (1979) 25 Cal.3d 668, 674-675, superseded by statute on another point as stated in *People v. Elmore* (2014) 59 Cal.4th 121, 138.)

We find no error. First, defendant did not rely on self-defense. Instead, defendant testified Ms. Ricks shot Mr. Burks. Defendant said he was unarmed and struggling with Mr. Burks when Ms. Ricks fired her weapon. Defendant was surprised. He did not know Ms. Ricks was armed. Second, even if there was substantial evidence of self-defense, an instruction on self-

16

defense would have been inconsistent with defendant's theory at trial—that he did not shoot Mr. Burks, in fact, he was not even armed. Therefore, the trial court had no sua sponte duty to instruct on self-defense.

Defendant has not established his attorney was ineffective. The record does not show why trial counsel did not request a self-defense instruction. But not doing so was a reasonable tactical choice. Ms. Lashley-Hayes relied on a defense that Ms. Ricks shot Mr. Burks, not defendant. She gave the jury a clear choice between believing defendant told the truth when he confessed and believing he told the truth at trial. The jury *could* reasonably have concluded defendant confessed to a crime he did not commit because he loved Ms. Ricks and did not want her to go to prison. Such a conclusion would have been consistent with defendant's conversation with the detectives insofar as defendant professed his love for Ms. Ricks and his desire that she not be held in any way responsible for the murder. That the jury did not so find does not undermine the validity of Ms. Lashley-Hayes's approach. This court will not second-guess trial counsel's decisions as to trial tactics. (*People v. Riel, supra,* 22 Cal.4th at p. 1185; *People v. Avena, supra,* 13 Cal.4th at p. 444.)

[Part III (C) is to be published.]

C. Lesser Included Offense Voluntary Manslaughter Instructions

The trial court instructed the jury on first and second degree murder. The trial court instructed that if the prosecution failed to prove a willful, deliberate, premeditated murder beyond a reasonable doubt, then the jury must find defendant guilty of

17

second degree murder.  (CALCRIM No. 521.)  The jury convicted defendant of first degree murder.  The jury further found defendant personally discharged a firearm causing Mr. Burks's death.

On appeal, defendant asserts the trial court should have sua sponte instructed on voluntary manslaughter based on heat of passion and imperfect self-defense.  Defendant argues:  "Given the evidence that [Mr.] Burks, a member of [defendant's] former gang, insulted [defendant] and attacked him with scissors before the shooting, a reasonable juror could have found that [defendant] actually believed that he needed to use deadly force to defend himself.  If this belief was not found to be objectively reasonable, then the killing would only be voluntary manslaughter.  The killing would also have been voluntary manslaughter if [defendant] acted in a heat of passion arising from [Mr.] Burks's insult and attack.  The trial court was consequently required to instruct sua sponte on the lesser included offense of voluntary manslaughter based on imperfect self defense and heat of passion . . . ."  We conclude that under *People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1016-1022, there was no error.

Heat-of-passion and imperfect-self-defense voluntary manslaughter are lesser included offenses of murder.  (*People v. Simon* (2016) 1 Cal.5th 98, 132 [imperfect self-defense]; *People v. Cole* (2004) 33 Cal.4th 1158, 1215 [heat of passion].)  A trial court's duty to instruct on general principles of law, discussed above, extends to lesser included offenses.  (*People v. Breverman,* (1988) 19 Cal.4th 142, 154-155.)  Our Supreme Court has explained:  "A trial court has a sua sponte duty to 'instruct on a lesser offense necessarily included in the charged offense if there

18

is substantial evidence the defendant is guilty only of the lesser.' (*People v. Birks* (1998) 19 Cal.4th 108, 118.)  Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant has committed the lesser, but not the greater offense.  (*People v. Ochoa* (1998) 19 Cal.4th 353, 422.)" (*People v. Shockley* (2013) 58 Cal.4th 400, 403.)  In *People v. Cruz* (2008) 44 Cal.4th 636, 664, our Supreme Court emphasized, "[T]he 'substantial' evidence required to trigger the duty to instruct on such lesser offenses is not merely '*any* evidence . . . no matter how weak' (*People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12), but rather "'evidence from which a jury composed of reasonable [persons] could . . . conclude[]'" that the lesser offense, but not the greater, was committed.  (*Id.* at p. 684, quoting *People v. Carr* (1972) 8 Cal.3d 287, 294; [*People v.*] *Barton* [(1995)] 12 Cal.4th [186,] 201, fn. 8; *People v. Breverman, supra,* 19 Cal.4th at pp. 162-163.)"  (Accord, *People v. Castaneda* (2011) 51 Cal.4th 1292, 1327-1328.)  Further, our Supreme Court has held, "The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given.  (*People v. Mosher* (1969) 1 Cal.3d 379, 393[, disapproved on another ground in *People v. Ray* (1975) 14 Cal.3d 20, 32]; *People v. Graham* (1969) 71 Cal.2d 303, 319 [same].)"  (*People v. Breverman, supra,* 19 Cal.4th at pp. 154-155.)  Moreover, the trial court must instruct on a lesser included offense supported by the evidence even when it is inconsistent with the defendant's chosen defense. (*People v. Breverman, supra,* 19 Cal.4th at pp. 157, 162-163; *People v. Sedeno* (1974) 10 Cal.3d 703, 717, fn. 7, disapproved on another point in *People v. Breverman, supra,* 19 Cal.4th at p. 163, fn. 10.)

Both heat-of-passion and imperfect-self-defense voluntary manslaughter focus on the defendant's subjective state of mind. (*People v. Sinclair, supra,* 64 Cal.App.4th at p. 1015.)  For heat-of-passion voluntary manslaughter to apply, the defendant must be under the actual influence of a strong passion that obscures reason at the time of the homicide.  (*People v. Wickersham* (1982) 32 Cal.3d 307, 326-327 disapproved on another point in *People v. Barton,* (1995) 12 Cal.4th 186, 201.); *People v. Sinclair, supra,* 64 Cal.App.4th at pp. 1015-1016.)  Imperfect self-defense requires that the defendant be in actual fear of imminent danger to life or great bodily injury at the time of the homicide.  (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082; *People v. Sinclair, supra,* 64 Cal.App.4th at p. 1016.)

Our review is de novo.  (*People v. Nelson* (2016) 1 Cal.5th 513, 538; *People v. Simon, supra,* 1 Cal.5th at p. 133.)  Our Supreme Court held:  "'On appeal, we review independently the question whether the trial court improperly failed to instruct on a lesser included offense.' (*People v. Souza* (2012) 54 Cal.4th 90, 113.)" (*People v. Nelson, supra,* 1 Cal.5th at p. 538.)

In *People v. Sinclair, supra,* 64 Cal.App.4th at page 1015, the defendant, charged with murder, testified before the jury that he was unarmed and never fired the fatal shot.  The jury convicted him of second degree murder and found he used a firearm.  (*Ibid.*)  On appeal, the defendant argued the jury should have received heat-of-passion and imperfect-self-defense voluntary manslaughter instructions.  Defendant reasoned such instructions were mandatory based on his testimony.  That testimony related to the argument with the victim and others.  This court, citing *People v. Medina* (1978) 78 Cal.App.3d 1000, 1005-1006, held the failure to so instruct sua sponte was not

error: "When defendant denied he shot the decedent, none of the alleged evidence of heat of passion and imperfect self-defense was of the type 'that a reasonable jury could find persuasive.' [Citation.]" Simply stated, the duty to instruct on inconsistent defenses does not extend to cases such as this where the sworn testimony of the accused [that he was unarmed and did not shoot anybody] completely obviates any basis for finding a lesser included offense." (*People v. Sinclair, supra,* 64 Cal.App.4th at pp. 1021-1022.) We also observed: "We do not mean to suggest that every time the accused completely denies under oath any participation in the charged homicide, there is no duty to instruct on lesser and necessarily included offenses. We acknowledge bright lines are difficult to draw in this case. However, the accused may confess or made admissions which indicate the fatal shooting occurred, for example, in the heat of passion. If the confession in which the accused admits shooting the deceased is presented to the jury, then it may be pertinent to the case in terms of conflicting evidence as to what occurred. There are no doubt other scenarios in which a defendant's under oath denial she or he committed a homicide may be colored by other testimony, which creates substantial evidence sufficient to support manslaughter instructions. However, . . . the present matter in which defendant denied being armed and shooting the decedent is not such a case." (*Id.* at p. 1020.)

Here, prior to trial, defendant confessed to an intentional killing. Defendant told detectives he was the aggressor, and he did not claim or suggest he (or anyone else) killed Mr. Burks in self-defense. Rather, defendant made it clear he was angry at Mr. Burks and retaliated against him for that reason. At tria, before the jury, by contrast, defendant denied shooting Mr.

21

Burks.  Defendant denied even being armed when Mr. Burks was shot.  If defendant was to be believed, he took no part in the homicide.  Under defendant's testimony, it was Ms. Ricks who shot Mr. Burks.

Under no view of the evidence was defendant guilty of only voluntary manslaughter.  Defendant's trial testimony would not permit a jury composed of reasonable persons to conclude he was guilty of voluntary manslaughter but not murder, nor would his confession to the detectives, which was plainly inconsistent with his trial testimony and provided no support for a lesser included offense verdict on the murder charge.  Unlike the hypothetical scenario discussed in *Sinclair,* defendant's confession did not indicate the fatal shooting occurred in the heat of passion or imperfect self-defense.  (*People v. Sinclair, supra,* 64 Cal.App.4th at p. 1020.)  The evidence was such that defendant was either guilty of murder or not guilty of any offense.  Under these circumstances, the failure to sua sponte instruct on voluntary manslaughter was not error.  (*People v. Sinclair, supra,* 64 Cal.App.4th at pp. 1018-1020; see also *People v. Leach* (1985) 41 Cal.3d 92, 106 [defendant who denied taking part in a robbery was not entitled to lesser included grand theft instruction]; *People v. Trimble* (1993) 16 Cal.App.4th 1255, 1260 [defendant who denied committing vehicular burglary was not entitled to lesser included auto tampering instruction]; *People v. Medina, supra,* 78 Cal.App.3d at pp. 1005-1006 [defendant who relied on alibi defense to murder was not entitled to diminished capacity instructions]; *People v. Salas* (1978) 77 Cal.App.3d 600, 607-608 [defendant relying on alibi defense to robbery was not entitled to a simple assault instruction]; *People v. Whalen* (1973) 33 Cal.App.3d 710, 718 [no error in failing to instruct on assault

with a deadly weapon where defendant, charged with assault with a deadly weapon on a police officer, denied pointing a gun at the officer].)  Given the foregoing analysis, we need not discuss whether the failure to sua sponte instruct on voluntary manslaughter, even if error, was harmless.

[Parts III (D)-(H) are deleted from publication.  See *post* at page 28 where publication is to resume.]

D.  Prosecutorial Misconduct

Defendant argues the prosecutor, Deputy District Attorney Bobby Zoumberakis, in his closing argument, prejudicially misstated the law of premeditation and deliberation.  And because no objection was interposed to the prosecutor's argument, defendant argues Ms. Lashley-Hayes was constitutionally ineffective.  We find Mr. Zoumberakis committed no misconduct.

Our Supreme Court has set forth the principles governing prosecutorial misconduct in argument to the jury.  ""'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct so 'egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"" (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214; *People v. Espinoza* (1992) 3 Cal.4th 806, 820.) Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""'the use of deceptive or reprehensible methods to attempt to persuade either the court of the jury.'"" (*People v. Espinoza, supra,* 3 Cal.4th at p. 820.)' (*People v. Samayoa* (1997)

23

15 Cal.4th 795, 841 . . . .)" (*People v. Hill* (1998) 17 Cal.4th 800, 819; accord, *People v. Peoples* (2016) 62 Cal.4th 718, 792.) Further, "'"'[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.]"'"'" (*People v. Hill, supra,* 17 Cal.4th at p. 819, accord, *People v. Peoples, supra,* 62 Cal.4th at p. 796.) To prevail on a claim of prosecutorial misconduct based on comments to a jury, the defendant must show a reasonable likelihood the jury understood or applied the challenged comments in an improper or erroneous manner. (*People v. Frye* (1998) 18 Cal.4th 894, 970 disapproved on another point in *People v. Doolin,* (2009) 45 Cal.4th 390, 421, fn. 22.); *People v. Samayoa, supra,* 15 Cal.4th at p. 841.)

The jury was instructed on the definition of premeditation and deliberation. The jury was properly instructed: "The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time." (CALCRIM No. 521; *People v. Houston* (2012) 54 Cal.4th 1186, 1216; *People v. Lee* (2011) 51 Cal.4th 620, 636.)

Mr. Zoumberakis argued: "So when you look at first-degree murder, this is where I need to prove to you that it was willful, deliberate, and premeditated. The law defines it in a very common sense way. [¶] Willful means that the defendant

24

intended to do it. It wasn't an accident. He did it willfully. Deliberate means that the defendant weighed the considerations for and against his choices and knowing the consequences, decided to kill. And premeditated means the defendant decided to kill before committing the act that caused death. Those are the definitions. [¶] You do this every day, and you do it often. You do it frequently when you're driving. You're in your car. You're doing 55 on a 45 on the street, light turns to yellow and in a second you are able to think, one, 'Am I going too fast to stop, or should I hit the gas?' Two, what is the traffic lane like around me? Is it in the middle of the night? Is it late, or is it rush hour where people might be trying to come through? Three, who else is in my car? Am I by myself where I intend to drive a little more recklessly, or is there somebody in my car that I want to make sure gets somewhere safer than I do? All these things come into your mind in seconds, and the law understands that, and that's why it tells you that willful, deliberate, and premeditated can be done in a matter of seconds."

Defendant asserts the prosecutor's example misled the jury to believe the premeditation, deliberation and willfulness element of first degree murder did not require substantial pre-existing reflection. We disagree. Mr. Zoumberakis used the yellow light example to illuminate the amount of time in which a decision to kill could be reached. In Mr. Zoumberakis's analogy, the driver considered whether to brake or speed up, whether there was traffic around him or her, what time of day it was, and whether he or she was alone in the vehicle. This was a proper example of a quick decision that is nevertheless considered and calculated. (*People v. Avila* (2009) 46 Cal.4th 680, 715.) Mr. Zoumberakis's argument was consistent with the relevant jury instruction. The

25

jury would have understood the point—that premeditation and deliberation can occur quickly.  Moreover, the jury was instructed that, "If you believe that the attorneys' comments on the law conflict with my instructions, you  must follow my instructions." ~(CT 2:383)~ We presume the jury followed that instruction. (*People v. Charles* (2015) 61 Cal.4th 308, 324, fn. 8; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 447.)  It is not reasonably likely the jury misconstrued or misapplied the example in an objectionable fashion.  (*People v. Thomas* (2012) 53 Cal.4th 771, 797; *People v. Cole, supra,* 33 Cal.4th at pp. 1202-1203.)  And because Mr. Zoumberakis's argument was a proper example of a decision reached quickly, defense counsel was not ineffective for failing to make an unmeritorious objection.  (*People v. Lucero* (2000) 23 Cal.4th 692, 734; *People v. Ochoa, supra,* 19 Cal.4th at p. 431; *People v. Lucas* (1994) 12 Cal.4th 415, 475.)

In *People v. Avila, supra,* our Supreme Court considered a similar comparison and found no misconduct.  There, "[T]he prosecutor used the example of assessing one's distance from a traffic light, and the location of surrounding vehicles, when it appears the light will soon turn yellow and then red, and then determining based on this information whether to proceed through the intersection when the light does turn yellow, [as] an example of a 'quick judgment' that is nonetheless 'cold' and 'calculated.'" (*Ibid.*)  In *Avila,* the prosecutor also added: 'Deciding to and moving forward with the decision to kill is similar, but I'm not going to say in any way it's the same.  There's great dire consequences that have a difference here.' (*Ibid.*) Defendant asserts this final comment saved an otherwise improper argument.  But our Supreme Court did not so hold.

26

Instead, our Supreme Court found the final comment was an additional reason the argument was not misconduct.

## E.  Cumulative Error

Defendant contends he is entitled to reversal because of cumulative error.  We find no prejudicial legal error.  Therefore, we reject defendant's argument the cumulative effect of all the errors requires reversal.  (*People v. Jones* (2013) 57 Cal.4th 899, 981; *People v. Edwards* (2013) 57 Cal.4th 658, 746.)

## F.  Confidential Prison Records

Defendant has asked we independently review confidential Department of Corrections and Rehabilitation records to determine whether the trial court correctly refused to disclose to him.  On April 13, 2016, we ruled:  "The court has read the sealed documents.  The request of defendant . . . to view any of the sealed documents is denied.  Any disclosure to the defense or the public is barred by the official privilege.  (Evid. Code, § 1040, subds. (a)-(b).)"  It follows that the trial court did not err in ruling the records were not discoverable.

## G.  Restitution

The trial court orally imposed a $300 restitution fine.  (§ 1202.4, subd. (b)(1).)  The trial court erred in failing to orally impose a parole revocation restitution fine in the same amount.  (§ 1202.45; *People v. Rodriguez* (2000) 80 Cal.App.4th 372, 378.)

The judgment must be modified to so provide.  The abstract of judgment is correct in this regard and need not be amended.

## H.  Abstract of Judgment

The trial court orally imposed a $30 assessment under Government Code section 70373, subdivision (a)(1).  The abstract of judgment reflects a $300 such assessment.  The abstract of judgment must be amended so that it is consistent with the oral pronouncement of judgment.  (*People v. Delgado* (2008) 43 Cal.4th 1059, 1070; *People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2.)

[The balance of the opinion is to be published.]

## IV. DISPOSITION

The oral pronouncement of judgment is modified to impose a $300 parole revocation restitution fine under Penal Code section 1202.45. The judgment is affirmed in all other respects. Upon remittitur issuance, the clerk of the superior court is to prepared an amended abstract of judgment reflecting a $30 assessment under Government Code section 70373, subdivision(a)(1) instead of a $300 such assessment, and deliver a copy to the Department of Corrections and Rehabilitation.

CERTIFIED FOR PARTIAL PUBLICATION*

TURNER, P.J.

We concur:

BAKER, J.

KUMAR, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.